# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **KELVIN O. SLAUGHTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:15-CV-1216-VEH** |
| | ) | |
| **L.B. FOSTER COMPANY,** *a* | ) | |
| *Pennsylvania Corporation*, | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

This employment discrimination case was filed on July 20, 2015, by the Plaintiff, Kelvin O. Slaughter, against his former employer, the Defendant, L.B. Foster Company. (Doc. 1). The Complaint alleges race-based discrimination (Count One) and retaliation (Count Two) in the workplace in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e (Title VII).

The case comes before the Court on the Defendant's motion for summary judgment. (Doc. 22). For the reasons stated herein, the motion will be **GRANTED** and this case will be **DISMISSED with prejudice**.

## I.    STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there

is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the

3

non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.   FACTS[1]

### A.   L.B. Foster's Business and Organization

L.B. Foster is a leading manufacturer, fabricator, and distributor of products and services for the rail, construction, energy, and utility markets with global locations, including in North America and Europe. L.B. Foster operates individual business units that specialize in rail, energy, utility, construction, and tubular products. The Coated Products pipe coating facility in Birmingham, Alabama applies protective coatings to steel line pipe and pipe piling to protect from corrosion in the harshest environments.

L.B. Foster is an equal employment opportunity employer and is committed to providing a workplace that is free from unlawful discrimination and retaliation. The EEO and Harassment Prevention policies are posted in the break room at the Birmingham facility.

---

[1]  The facts set out herein are gleaned in substantial part on the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed, it has been included herein <u>exactly</u> as it was proffered, without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact <u>as stated</u>. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact as proffered, with citation to the evidence supporting the fact as proffered. If the evidence did support a dispute, the fact was cast, as this Court must, in the light most favorable to the non-movant, with citation to the evidence supporting the fact in that light. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

### B.     Management Involved in the Promotion Decision

As will be discussed later in this opinion, the Plaintiff, Kelvin O. Slaughter, claims that he was illegally denied a promotion to the position of "Production Supervisor" because of his race. In October of 2014, Richard "Rick" Jones and Morris Moore together made the decision to promote Jeff Price into that position instead of the plaintiff.

The Birmingham facility is run by Jones, the Plant Manager, who is Caucasian. Jones worked as the Plant Engineer at the Birmingham facility from June 2012 through June 2014, and has been the Plant Manager since June 2014. Patrick Petrino, a male, was the Plant Manager when Slaughter was hired at L.B. Foster. Jones replaced Petrino as Plant Manager.

Moore, who is African American, is the Director of Continuous Improvement & Organizational Development at L.B. Foster. Although Moore is based at the corporate office in Pittsburgh, Pennsylvania, he was at the Birmingham facility periodically from June 2014 through October 2014 to help Jones transition into the role as Plant Manager. Slaughter does not accuse Moore of taking any action against him because of his race.

### C.     Organization of the Birmingham Facility

The Birmingham facility is divided into two departments—the plant and the

yard. The events in this case took place in the plant.

During Slaughter's employment, two (2) Production Supervisors oversaw the employees in the plant. Johnny Sides, who is Caucasian, was a Production Supervisor from September 9, 2012, until he was discharged by Jones on September 25, 2015. Jason Guidry, who is Caucasian, was a Production Supervisor from October 18, 2013, until Jones and Jim Harris terminated his employment on August 20, 2014, due to his poor performance. There are three (3) areas in the plant: the Powder Booth, Cleaning Line, and Exit Rack. Each area has a Team Lead and an Assistant Team Lead with leadership responsibilities over the employees in their areas.

### D.    Jeff Price

A substantial portion of the workforce at the Birmingham facility is made up of temporary employees provided by a company named "Automation," a staffing agency. In June 2014, Automation assigned Jeff Price, who is Caucasian, to the Birmingham facility as the On-Site Coordinator/Liaison for Automation. In that role, Price was responsible for supervising all temporary employees, monitoring their attendance and break periods, issuing corrective action for attendance and break period issues, and ensuring they follow safety rules. Price performed these job duties effectively, took initiative as a supervisor, and was never late to work. Price does not have a college degree.

7

The Birmingham facility is currently running one (1) shift. However, in August and September, 2014, the facility ran a temporary night shift to clean the inside of pipes being processed for a particular order. This internal diameter night shift ("ID night shift") ran seven days per week for approximately six to seven weeks. Because of Price's consistent punctuality and effectiveness as supervisor over the temporary employees, Jones assigned Price to act as Production Supervisor over the ID night shift. This was before a permanent position of Production Supervisor had ever been posted as available.

The goal for the ID night shift was to clean approximately twenty-five pipes per night and have them ready for the morning shift to recoat. Additionally, the night shift crew was required to have all the machinery prepared for the day shift to take over. While Price was the supervisor, the ID night shift cleaned on average forty-five to fifty-five pipes per night, with a maximum of approximately seventy pipes in one shift. Price sustained these results continuously through the duration of his assignment as supervisor over the ID night shift. He did this while fully preparing the plant for on-time startup the next morning and maintaining his role as supervisor over the temporary employees.

During this time, Price also supervised the Plaintiff from time to time, even though, technically, Price was still an employee of Automation. Price participated in

the discipline of the Plaintiff via write-ups during this time as well.

### E. Kelvin Slaughter

Slaughter, who is African American, was hired as an L.B. Foster employee on September 3, 2012. Slaughter worked as the Team Lead on the Exit Rack, which conducts the final inspection of pipes before they leave the facility. As a Team Lead, Slaughter had leadership responsibilities over the team members in his area, and supervised between fourteen and sixteen employees. (Doc. 22-4 at 18(69)).[2] His duties and responsibilities included ensuring that his team members followed safety procedures, coordinating his team members' break and lunch periods, ensuring that employees notified other team members or supervisors prior to taking breaks, maintaining quality standards, and conducting the final inspection of pipes before they left the facility. Slaughter does not have a college degree.

As a Team Lead, Slaughter was required to be at work in time to attend the production meetings with the Plant Manager, Production Supervisors, Team Leads and Assistant Team Leads.  On production days, the meetings are held at 5:15 a.m.

---

[2] In his brief, the Plaintiff proffers the following fact:

13. L.B. Foster employs no African American males in supervisory positions at
L.B. Foster's Birmingham location (Id.)

(Doc. 24 at 9, ¶13). The citation is to the Plaintiff's deposition and does not support this fact as stated. Further, since Slaughter is African American and agrees that he supervised employees, the statement is incorrect.

if working the day shift and at 5:15 p.m. if working the night shift. According to his Time and Attendance-Employee Timecard report for 2014, Slaughter was frequently tardy for work–a total of seventy-five times from January 1, 2014, to December 7, 2014. (Doc. 22-1 at 4, ¶11; doc, 22-1 at 21-27). Broken down by month, the totals are: 9 in January 2014; 11 in February 2014; 6 in March 2014; 5 in April 2014; 5 in May 2014; 7 in June 2014; 11 in July 2014; 10 in August 2014; 7 in September 2014; 2 in October 2014; and 2 in November 2014. (Doc. 22-1 at 21-27).[3]

On or about September 30, 2014, Jones reviewed the attendance records of the plant employees during the previous three months and had write-ups issued to employees who were late on a continuous basis during this period. Slaughter, along with three other employees, received written warnings in late September 2014 for

---

[3] The facts in this paragraph were originally proffered by the Defendant as the following: "70. Slaughter was frequently tardy to work and was written up due to his attendance in 2014. [Jones Dec. Exs. 2 and 3]." (Doc. 23 at 13, ¶70). The Plaintiff responded with:

> 70. Slaughter disputes that he was frequently tardy to work. Slaughter was not written up at all, much less for tardiness until after he and Price were interviewed for the third Production Supervisor position (Slaughter Dep. Doc. 22-4 123:2-4.)

(Doc. 24 at 6, ¶70). The citation provided by the Plaintiff is to a portion of Slaughter's deposition where he states:

> Until I applied for the production supervisor position, I had never been written up. All write-ups occurred after I applied for the production supervisor position, every last one.

(Doc. 22-4 at 31(123)). This testimony does not dispute that the Plaintiff was "frequently" tardy.

excessive tardiness. Slaughter's Time and Attendance-Employee Timecard report for 2014 reveals that, during that period, he was tardy a total of twenty-eight times (11 in July 2014; 10 in August 2014; 7 in September 2014). (Doc. 22-1 at 24-26). By comparison, the other Team Leads' and Assistant Team Leads' attendance during this period were as follows: Jacob Preacher was tardy zero times (doc. 22-1 at 57-58), Irving Ramirez was tardy zero times (doc. 22-1 at 48-50), Kevin Clayton was tardy five times (doc. 22-1 at 39-41), and Robert Henderson was tardy thirteen times (doc. 22-1 at 62-64).

During his entire employment at L.B. Foster, Slaughter heard racial slurs at work on two occasions. On both occasions, the remarks were made by outside inspectors not employed by L.B. Foster. On both occasions, Plant Manager Jones had those individuals escorted off L.B. Foster's premises and made it clear that that type of behavior was not tolerated by L.B. Foster.

### F.   Production Supervisor Openings During Slaughter's Employment

The Coated Pipe Production Supervisor position is a salaried position. The job duties of Production Supervisors at the Birmingham facility include monitoring plant production goals, ensuring a safe and clean working environment, supervising plant employees, ensuring employees follow proper procedures, monitoring attendance and vacation of plant employees, ensuring production goals are met, and ensuring the

production of quality products. There have been four Production Supervisor vacancies during Mr. Slaughter's employment.

### 1. *The First Production Supervisor Opening*

In his declaration, Jones states that the first position was posted on August 14, 2012. (Doc. 22-1 at 6, ¶15).[4] In his deposition, Slaughter states that he applied for this position and was interviewed.[5] Johnny Sides, who is Caucasian, was selected for this position on September 10, 2012.

### 2. *The Second Production Supervisor Opening*

The second vacancy was for a Production Supervisor position on the second shift. This position was posted on November 28, 2012, and Slaughter applied for it

---

[4] This fact was proffered by the Defendant. The Plaintiff's response to this fact is:

47. Plaintiff disputes that he applied for this position. Slaughter did not become an employee of L.B. Foster until September of 2012 (Slaughter Dep., Doc. 22-4.).

(Doc. 24 at 5, ¶47). This response does not dispute the Defendant's proffered fact.

[5] Strangely, in the Plaintiff's proffered facts he states:

3. In screening candidates for the job of Production Supervisor for which Slaughter applied for in August 2012, L.B. Foster administered a questionnaire to Slaughter, which he was instructed to take home, and "look over" (Slaughter Dep., Doc. 22-4, pg. 36:17-22.)

4. Slaughter was given an interview for the position of Production Supervisor but L.B. Foster never followed up with an interview [sic]. Later, Johnny Sides, a Caucasian male was hired for the Production Supervisor job. (Id. at 37:1-6.)

(Doc. 24 at 8). Yet, in responding to the Defendant's proffered facts, Plaintiff "disputes that he applied for this position." (Doc. 24 at 5, ¶47).

on December 8, 2012. However, no one was selected for this position because the second shift was eliminated at the Birmingham facility and the posting was canceled.

### 3.   *The Third Production Supervisor Opening*

The third Production Supervisor opening was posted on February 11, 2013. Jason Guidry, who is Caucasian, was selected for this position on October 18, 2013. Had Slaughter been awarded this position, his salary would have increased.

Slaughter testified in his deposition that he applied for this position and was asked to take a twenty-five question math test on which he scored higher than other test takers. (Doc. 22-4 at 10(37)). However, he states that he was then personally told that no one who had taken the test was qualified for the position because none of those individuals had a college degree. (Doc. 22-4 at 10(39)). According to Slaughter, the job posting for the position did not state that a college degree was a requirement. (Doc. 22-4 at 10(39)). Slaughter also testified that Guidry told Slaughter that he (Guidry) was hired for the position two weeks before Slaughter took the test. (Doc. 22-4 at 12(45-46)).

Guidry had no prior experience in the coating industry. Slaughter has certifications related to the Defendant's business. Slaughter ended up training Guidry on the Exit Rack. (Doc. 22-4 at 14(54)).

13

### 4.     *The Fourth[6] Production Supervisor Opening*

The fourth Production Supervisor vacancy opened after Rick Jones terminated Guidry, due to performance issues, on August 21, 2014. Slaughter spoke to Moore about the position and Moore encouraged Slaughter to apply.[7] Price also expressed interest in the position. (Doc. 22-1 at 6-7, ¶18).

Moore explained to Slaughter the process for selecting a Production Supervisor. Slaughter asked Moore prior to taking the exam for the Production Supervisor position if anything in Slaughter's personnel file would disqualify him from the position of Production Supervisor. Moore told Slaughter that he was qualified.

Slaughter and Price submitted resumes for this vacancy. The position was ultimately awarded to Price. According to Slaughter's resume, the only supervisory experience he possessed was his work as a Team Leader at L.B. Foster. According to Price's resume, he had several years of managerial experience in addition to his

---

[6] This position is referred to by the Plaintiff as the "third" opening. The disparity in how the parties refer to the opening is likely due to the fact that the "second" opening to which the Defendant refers is probably not considered to be an opening by the Plaintiff, since he did not apply for that position and no one was hired for it. Regardless, the Court has adopted the numbering system used by the Defendant.

[7] In his declaration, Moore states that "Slaughter . . . approached me about this vacancy and I encouraged him to apply for the job if [he] thought his skill set was sufficient." (Doc. 22-5 at 2, ¶3). In his sworn EEOC charge, Slaughter states that Moore approached him about applying for the position. (Doc. 24-1 at 2).

supervisory duties for Automation at L.B. Foster. Neither Slaughter nor Price has a college degree.

Because this was a salaried position, both Slaughter and Price took a leadership assessment test. It is undisputed that the assessment test is used to identify possible areas of concern within an applicant's personality. In his deposition, Jones testified that he looked at the assessment scores for Price prior to Price becoming the Production Supervisor. (Doc. 22-3 at 14(55)). In Moore's declaration, he states that he "reviewed the . . . assessments for Mr. Slaughter and Mr. Price before [he and Jones] interviewed both candidates for the job." (Doc. 22-5 at 2, ¶5). Moore also stated that

> [t]he purpose of the assessment is to identify areas of inquiry to be explored during a job interview, and the assessment results include suggested interview questions. The assessment is no more than a guide to provide insight into the candidates' strengths and weaknesses. It is not a pass/fail test.

(Doc. 22-5 at 2, ¶5). Slaughter had fewer below desired scores on the assessment than did Price.[8]

Jones and Moore met with Slaughter and Price, and they were the only candidates Jones and Moore interviewed for the position. Jones based his selection

---

[8] Only after Slaughter took the assessment did he begin receiving write-ups.

15

for this job on the candidates' job performance, attendance, leadership skills, and the impact of the selection on his reputation in the plant. Moore evaluated each candidate based on their job performance, attendance, and leadership skills. In terms of performance, Price exceeded all expectations while acting as Production Supervisor over the ID night shift. In terms of punctuality, Price has never been late to work at L.B. Foster.

Slaughter testified that, when interviewed by Jones and Moore,

Mr. Jones started asking me questions about Johnny Sides, how did I get along, what was my interpretation of Johnny. And I was like what does that have to do with production supervisor?

(Doc. 22-4 at 23(89)).[9]

After interviewing Price and Slaughter, Jones and Moore agreed that Price was the best candidate for the position. Moore and Jones did not discuss the race of either candidate and it was not a factor in their selection decision.[10] Jones and Moore met

---

[9] The Plaintiff insists that he was asked "more questions about . . . Sides by . . . Jones . . . than he was asked about the job." (Doc. 24 at 6-7). He cites to his own deposition testimony in support of this statement. However, nothing in the portion of his deposition which he cited supports the Plaintiff's assertion.

[10] The Plaintiff admits that race was not a factor in his non-selection for this position. (*See*, doc. 23 at 13, ¶72 ("72. Moore and Jones did not discuss the race of either candidate and it was not a factor in their selection decision. [Jones Dec. ¶ 18; Moore Dec. ¶ 9]."), *not disputed by Plaintiff in* doc. 24). The Plaintiff proffers the following fact:

16. Slaughter believes that Jones, Plant Manager at L.B. Foster's Birmingham location discriminated against him in the hiring for the . . . Production Supervisor job for which Slaughter applied (*Id*. at 58:17-19.)

with Slaughter in October 2014 and informed him he was not selected for the position. In his deposition, Slaughter stated that this was conveyed to him during his interview for the job, and further that, at that time, Jones said to Slaughter: "[Y]ou interview better than [Price], you got more experience than [Price], you scored higher than [Price], but we decided we're going to go another direction and hire . . . Price." (Doc. 22-4 at 23(89-90)). Had Slaughter been awarded this position, his salary would have increased.

Slaughter filed his initial EEOC charge on October 31, 2014. (Doc. 22-4 at 102). There is no reference in this charge to alleged pay discrimination, but it does reference two promotion decisions concerning the selections of Sides and Price and two write-ups.

### G.   **Slaughter's Other EEOC Charges**[11]

Slaughter filed a second charge on March 6, 2015, alleging retaliation by Johnny Sides. (Doc. 22-4 at 104). While the second charge alleges that Sides

---

(Doc. 24 at 9-10, ¶16). Slaughter's "belief" is not a "fact." *See, Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002) ("[A]n affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact."); *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."). The proffered fact will not be included.

[11]  Because, as explained *infra*, Slaughter has abandoned is retaliation claims, the Court omits substantive discussion of them, or the facts relating to them.

threatened to take disciplinary action against Slaughter, the charge states clearly that Sides did not actually discipline or discharge Plaintiff.

A third charge appears to have been submitted on Slaughter's behalf sometime in January 2016 alleging he was discharged in retaliation for his prior EEOC charges. (Doc. 22-4 at 106). According to the EEOC portal, this charge was uploaded on January 28, 2016, more than 180 days after Slaughter's termination.

## III.   ANALYSIS

### A.   <u>Abandoned Claims</u>

The Defendant has moved for summary judgment as to <u>all</u> of the Plaintiff's claims. In response, the Plaintiff does not discuss his retaliation claims (Count Two) at all. Accordingly, the Court deems Count Two to be abandoned. *See, Brackin v. Anson*, 585 F. App'x 991, 994 (11th Cir. 2014) ("The parties bear the burden of formulating arguments before the district court, and 'grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned' and will not be considered on appeal.") (quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995)). Summary judgment will be granted as to Count Two.

Also, in response to the motion for summary judgment, the Plaintiff only argues that he was subjected to discrimination based on his race (Count One) in the failure to hire him for the <u>fourth</u> Production Supervisor opening. Any other basis for

18

Count One is therefore deemed to be abandoned.[12] Summary judgment will also be

granted as to these abandoned claims in Count One.

---

[12] That is not to say that other promotions are not "alluded to" in the Plaintiff's argument. (*See*, doc. 24 at 15 ("Slaughter was thrice passed over for promotion in favor of less qualified Caucasian males."); doc. 24 at 15-16 (discussing the "jobs of Production Supervisor" and stating that "Slaughter was passed over for these <u>positions</u>[.]") (emphasis added); doc. 24 at 18 (". . . the denial of Slaughter's promotion on three separate occasions[.]"); doc. 24 at 19 ("L.B. Foster's handling of Slaughter's applications for the Production Supervisor <u>positions</u> are suspect[.]") (emphasis added)). However, the Plaintiff's argument is <u>clearly</u> directed to only the fourth posting, and "district courts should not be expected to construct full blown claims from sentence fragments[.]" *T.P. ex rel. T.P. v. Bryan Cty. Sch. Dist.*, 792 F.3d 1284, 1291 (11th Cir. 2015) (internal quotations and citations omitted).

Regardless summary judgment is appropriate as to these other claims as well. The Defendant argues:

> A plaintiff must file a charge of discrimination with the EEOC within 180 days of the alleged discrimination. See 42 U.S.C. § 2000e-5(e). If the plaintiff fails to do so, any claim relating to the alleged discrimination is procedurally barred for failure to exhaust administrative remedies. *See Delaware State College v. Ricks*, 449 U.S. 250, 256 (1980); Everett v. Cobb County Sch. Dist., 138 F.3d 1407, 1410 (11th Cir. 1998). Slaughter is legally prohibited from relying upon events that occurred more than 180 days before his initial EEOC charge of October 31, 2014 to support his Title VII claims (i.e., conduct that occurred on or after May 5, 2014). Accordingly, Slaughter cannot maintain Title VII claims based upon the September 10, 2012[,] promotion of Johnny Sides or the October 18, 2013[,] promotion of Jason Guidry. Likewise any alleged pay discrimination claims are barred because they are not referenced in any of Slaughter's EEOC charges.

(Doc. 23 at 19). The Plaintiff does not address this argument at all. As noted above, Slaughter filed his initial EEOC charge on October 31, 2014. (Doc. 22-4 at 102). This was more than 180 days after both the Sides and the Guidry promotions. Further, none of the Plaintiff's charges reference pay discrimination, and the Plaintiff does not argue pay discrimination in his brief. The Court finds the Defendant's argument on this point to be well taken and, for this additional reason, determines that the only claim remaining in Count One is the Title VII race discrimination claim based on the promotion of Price (the fourth Production Supervisor opening).

### B.      The Fourth Production Supervisor Opening

Price was selected to fill the Fourth Production Supervisor opening. The parties

agree that this is a circumstantial, as opposed to direct, evidence case.

> Under Title VII, it is unlawful for an employer "to fail or refuse
> to hire or to discharge any individual, or otherwise to discriminate
> against any individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such individual's
> race." 42 U.S.C. § 2000e–2(a)(1). "On any Title VII claim the plaintiff
> bears the ultimate burden of proving discriminatory treatment by a
> preponderance of the evidence." *Crawford v. Carroll*, 529 F.3d 961, 975
> (11th Cir.2008) (internal quotation marks omitted).When a Title VII
> claim is supported by circumstantial evidence, the district court analyzes
> the case using the burden-shifting framework set out in *McDonnell
> Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668
> (1973).*McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir.2008). Under
> *McDonnell Douglas*, the plaintiff has the initial burden to establish a
> prima facie case of disparate treatment . . .. If the plaintiff presents a
> prima facie case, and the employer offers a legitimate,
> non-discriminatory reason for the adverse employment action, the
> plaintiff must show that the stated reason is a mere pretext for unlawful
> discrimination. *Id*.

*Medearis v. CVS Pharmacy, Inc.*, 646 F. App'x 891, 896–97 (11th Cir. 2016).[13] The

Defendant has conceded the Plaintiff's *prima facie* case for purposes of the instant

motion. Thus, the burden shifts to the Defendant to offer a legitimate non-

discriminatory reason for Price's being promoted rather than Slaughter.

---

[13] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  U.S.Ct. of App. 11th Cir. Rule 36-2.

### 1. *Legitimate Non-Discriminatory Reasons*

The Defendant writes:

> Morris . . . agreed that Price was the better candidate based on job performance, attendance, and leadership skills. Each of these factors is a legitimate, non-discriminatory reason for the Company's decision and thus satisfies L.B. Foster's burden of production.

(Doc. 23 at 21; doc. 22-5 at 3, ¶8 (Moore Affidavit) ("I relied upon my evaluation of each candidate's job performance, attendance, and leadership skills."). The Defendant also writes:

> Rick Jones concluded that Price was a better candidate than Slaughter based on . . . job performance, attendance, leadership skills, and the likely impact on Jones if he promoted Slaughter in the face of Slaughter's poor attendance record.

(Doc. 23 at 21). In Jones's deposition, the following exchange took place:

> Q.     What was it that led you to ultimately determine that Mr. Price was more qualified for the job of production supervisor as opposed to Mr. Slaughter?
>
> A.     Overall job performance, attendance, leadership skills.
>
> Q.     Okay. So I've got overall job performance, attendance, and leadership skills. Anything else?
>
> A.     My reputation.
>
> Q.     Your reputation?
>
> A.     Yes.

21

Q.     Well, tell me how your reputation factors into whether or not Mr. Slaughter is less qualified than Mr. Price for the job of production supervisor?

A.     If I promote a guy with mediocre performance and an extremity [sic] subpar attendance record in my first five months as plant manager, I might as well quit.

Q.     So you were concerned about you losing your job?

A.     I would lose my leadership with every guy in the plant if I made that happen.

(Doc. 22-3 at 26(101-102)).

### 2.     *Pretext*

The Plaintiff claims that the reasons offered by the Defendant are a mere

pretext for discrimination. The Eleventh Circuit has noted that

> [t]he plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528. If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer. *See Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together

with the elements of the prima facie case, suffice to show intentional discrimination.").

*Kragor v. Takeda Pharm. Am., Inc.,* 702 F.3d 1304, 1308–09 (11th Cir. 2012).  In other words,

> once the employer offers evidence of a legitimate, nondiscriminatory reason for the adverse action, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [i]s discrimination vel non." *Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 (citations and internal quotation marks omitted). The opportunity provided to a plaintiff to show pretext is simply an opportunity to present evidence from which the trier of fact can find unlawful discrimination.

*Kragor*, 702 F.3d at 1308.  "'Therefore, ... a plaintiff is entitled to survive summary judgment ... if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action.'" *Usry v. Liberty Reg'l Med. Ctr., Inc.*, 560 F. App'x 883, 888 (11th Cir. 2014) (quoting *Combs*, 106 F.3d at 1529); *see also, Ash v. Tyson Foods, Inc.,* 392 F. App'x 817, 825 (11th Cir. 2010), *opinion vacated on reconsideration on other grounds*, 664 F.3d 883 (11th Cir. 2011) ("The law of this circuit is that a plaintiff must make an evidentiary showing creating a genuine issue of fact as to pretext for each of the defendant's proffered reasons, not merely for some or most of them.") (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024-25 (11th Cir.2000)). "'This evidence must reveal 'such weaknesses, implausibilities, inconsistencies,

incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir.2004)); *see also*, *Haugabrook v. Cason*, 518 F. App'x 803, 807 (11th Cir. 2013) (same). "A proffered reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Haugabrook*, 518 F. App'x at 807 (quoting *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1349 (11th Cir.2007)).

Before even examining the Plaintiff's argument, the Court notes that the Plaintiff admits that race was not a factor in his non-selection for this position. (*See*, doc. 23 at 13, ¶72 ("72. Moore and Jones did not discuss the race of either candidate and it was not a factor in their selection decision. [Jones Dec. ¶ 18; Moore Dec. ¶ 9]."), *not disputed by Plaintiff in* doc. 24). For this reason <u>alone</u>, and regardless of the credibility of the Defendant's proffered reasons, summary judgment is proper for the Defendant as to this claim. *See*, *Haugabrook*, 518 F. App'x at 807 ("A proffered reason is not pretext for discrimination 'unless it is shown both that the reason was false, <u>and that discrimination was the real reason</u>.'"(quoting *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1349 (11th Cir.2007) (emphasis

supplied).

### a.    The Plaintiff Fails To Rebut Each of the Defendant's Proffered Reasons for the Failure To Promote Him

The Defendant claims that summary judgment is appropriate because the Plaintiff fails to address any of the reasons proffered by the Defendant for the decision to hire Price. *See, Usry*, 560 F. App'x at 888 ("Therefore, ... a plaintiff is entitled to survive summary judgment ... if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of <u>each</u> of the employer's proffered reasons for its challenged action.") (internal quotations and citations omitted). Recall that Jones and Morris stated that they chose Price based on the criteria of job performance, attendance, and leadership skills. In one page of his brief, Slaughter <u>does</u> address these factors. (*See*, doc. 24 at 25-26).

### (1)    Job Performance

The Plaintiff states:

First, although Jones claim[s] to use overall job performance as part of the LNDR[14], that argument fails when one considers that Price was not even a L.B. Foster employee before or during the selection process and was not performing the same job as Slaughter, so any job comparison would be pointless.

(Doc. 24 at 26). This argument presupposes that by "job performance," Jones and

---

[14] This is the Plaintiff's abbreviation for "Legitimate Non-discriminatory Reason."

Morris meant that they were <u>comparing</u> Price and Slaughter's performance <u>on the same job</u>. There is no evidence that this is what they meant.

Further, it is undisputed that "Price exceeded all expectations while acting as Production Supervisor." (*See*, doc. 23 at 13, ¶68; not disputed in doc. 24). The Plaintiff has presented no evidence regarding his performance while doing his own job, so the Court is unable to say that he has shown that "job performance" is a reason unworthy of credence.

### (2)   Attendance

The Plaintiff writes:

> Next, Jones alleges to have relied upon attendance. However, Slaughter was never written up for tardiness until after he applied for the third Production Supervisor position.

(Doc. 24 at 26; *see also* doc. 24 at 23). He also notes that Price, along with Sides, allegedly at the instruction of Jones, signed the write-up.

This argument is without merit. The fact that Slaughter had a "write-up" was not mentioned as a basis for choosing Price over him– "attendance" was. It is undisputed that Slaughter had been late to work on <u>many</u> occasions and Price had never been late to work.[15]

---

[15] As noted previously, Slaughter's time and attendance timecard report reflects that he was frequently tardy – a total of seventy-five times from January 1, 2014, to December 7, 2014. (Doc. 22-1 at 4, ¶11; doc, 22-1 at 21-27).

### (3)     Leadership Skills

The Plaintiff argues:

> Jones's claims that he used leadership skills as another factor in
> determining that Price was more qualified than Slaughter for the third
> Production Supervisor position. However, as shown, Price was given the
> benefit of essentially having a "trial run" at the position before he even
> interviewed or took assessment tests for the position.

(Doc. 24 at 26). First, there is no evidence that the position which Price held–internal

diameter night shift ("ID night shift") supervisor, is the same position as the Coated

Pipe Production Supervisor position for which Price and the Plaintiff applied. Second,

the Plaintiff fails to explain why, or provide authority for the proposition that, it was

improper to allow Price to temporarily hold the ID night shift supervisor position, nor

that it was improper to give Price credit for his good work there.[16]

Further, the Plaintiff has provided no evidence that Jones was discussing only

leadership skills demonstrated in that temporary position alone, or that Slaughter had

similar or better leadership skills than Price which were not considered.[17] Indeed, the

---

[16] The Plaintiff states that "[g]enuine issues of facts [sic] exist for resolution by a jury
regarding whether L.B. Foster had preordained Price for the . . . Production Supervisor position."
(Doc. 24 at 24). The Plaintiff misses the point. Even if the Defendant had preordained Price for
the position, in order to be unlawful it would have had to have done so for a discriminatory
reason, which the Plaintiff has admitted was not the case.  *See*, discussion *supra* pp. 24-25.  The
Plaintiff makes no argument, and provides no evidence, that Price was temporarily given the
position to discriminate against the Plaintiff.

[17] This is understandable, since Slaughter admits that he does not know what criteria
Jones considered in selecting Price over him. (Doc. 22-4 at 23(92)). He also admits that he has no
idea whether Moore was involved in making the decision to select Price over him. (Doc. 22-4 at

evidence is all to the contrary. According to Slaughter's resume, the only supervisory experience he possessed was his work as a Team Leader at L.B. Foster. According to Price's resume, he had several years of managerial experience <u>in addition to</u> his supervisory duties for Automation at L.B. Foster.

### (4)   Jones's Reputation

Finally, the Plaintif argues:

> Lastly, Jones admits to using a totally subjective measure of his reputation when deciding to hire Price rather than promote Slaughter. (Jones Dep. 102:2-19). A reasonable jury could find that the reputation Jones sought to protect was one of discriminatory practices.

(Doc. 24 at 26). This totally speculative argument fails to explain (much less cite authority for) why a "subjective measure" is *per se* discriminatory. Further, as explained previously in this opinion, the measure was not actually subjective. The following exchange took place in Jones's deposition:

A.   If I promote a guy with mediocre performance and an extremity [sic] sub par attendance record in my first five months as plant manager, I might as well quit.

Q.   So you were concerned about you losing your job?

A.   I would lose my leadership with every guy in the plant if I made that happen.

---

24(94)). Finally, he admits that he does not know who made the decision to hire Price instead of him. (Doc. 22-4 at 24(94)).

(Doc. 22-3 at 26(101-102)). Jones was actually concerned about his reputation if he promoted a person who "objectively" had a poor attendance record.

### b.      Experience and Qualifications

Slaughter <u>does</u> argue that he was more experienced for the position than Price. However, the only evidence he cites in support of that statement is Jones's testimony that Slaughter had been with the company longer and so had more experience in that respect. (Doc. 24 at 20) (citing doc. 22-3 at 25(98-99)). Jones also testified that both Slaughter and Price "were very green" as far as technical knowledge of the workings of the Defendant. (Doc. 22-3 at 25(99)). Slaughter's longer tenure with the company does not tend to prove that the reasons Price was hired instead of him (job performance, attendance, leadership skills) were unworthy of credence. Further,

> "a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the person who received the position [s]he coveted." *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1349 (11th Cir.2007) (per curiam) (internal brackets & quotation marks omitted). The plaintiff "must show that the disparities between the successful applicant's and [her] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (internal quotation marks omitted).

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013). <u>If</u> the Plaintiff is arguing that his longer tenure with the company made him more qualified than Price, he has not shown, for that or any other reason, that no reasonable person, in the

exercise of impartial judgment, could have chosen Price over him.[18]

Slaughter testified that Moore and Jones told him that he scored higher than Price on the assessment test given for the position. (Doc. 22-4 at 75(300)-76(301); doc. 22-4 at 23(89-90)).[19] Slaughter insists that assessment tests given to himself and price were "part of the selection process for the . . . position." (Doc. 24 at 21). Thus, the argument goes, the Plaintiff should have been chosen for the position over Price.

Regardless of the Plaintiff's scores on the assessment tests[20], and contrary to the Plaintiff's contention, it is undisputed that "[t]he assessment is used to identify

---

[18] Slaughter insists that pretext is shown because Moore, prior to Slaughter applying for the position, told him that he was "qualified" for the position. (Doc. 22-4 at 90(359-360)). While the fact that Moore felt that Slaughter was "qualified," prior to Slaughter applying for the position, might establish an element of Slaughter's *prima facie* case of discrimination, it does not establish that the reasons Price was hired are unworthy of credence, and/or that discrimination was the real reason.

[19] Moore has submitted a declaration in which he states:

Contrary to Mr. Slaughter's deposition testimony, Rick Jones did not tell Mr. Slaughter "you interview better than Jeff, you have more experience than Jeff and you scored better than Jeff, but we're going in a different direction . . .."

(Doc. 22-5 at 4, ¶10). Moore does not address Slaughter's statement about what Moore said. Jones, in his declaration, denies that he told Slaughter "you interview better than Jeff, you have more experience than Jeff and you scored better than Jeff, but we're going in a different direction . . .." (Doc. 22-1 at 7, ¶19). Regardless, the Court will view this disputed fact <u>in the light most favorable to the Plaintiff</u>; this is, that this conversation did take place.

[20] While the actual test results <u>might</u> be included somewhere in the evidence provided by the parties, no party has cited to that evidence, and the Court, because it has no duty to do so, has not looked for it. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials."). Regardless, it is admitted that the Plaintiff scored better than Price.

possible areas of concern within [the candidate's] personality" (doc. 23 at 12, ¶62, not

disputed in doc. 24), not as a basis for selecting the best qualified candidate. The

following exchange took place in Jones's deposition:

> Q.     Okay. So did the personalty profile play any part in you selecting
>        Mr. Price over Mr. Slaughter for production supervisor?
>
> A.     No.
>
> Q.     Well, can you tell me why the personalty profile was even
>        generated if you were not going to review those?
>
> A.     Everyone that is hired for L.B. Foster, to my knowledge -- I took
>        one.
>
> Q.     Okay.
>
> A.     Everybody that is hired for L.B. Foster takes this personality
>        profile to my knowledge.

(Doc. 22-3 at 19(76)). The Plaintiff fails to discuss this testimony, or provide

evidence which refutes it.

Further, Moore and Jones both testified that the results had virtually no weight

at all. Moore testified that, although he considered the test results to be a "useful tool

in the interview process, [he] did not rely on the assessment scores in making [his]

decision concerning who [he] thought was the best candidate for the vacancy." (Doc.

22-5 at 3, ¶8). In his deposition, Jones acknowledged looking at Price's scores prior

to his being selected. (Doc. 22-3 at 14(55)). But, like Moore, he never states that they

were an important part of the selection process, or that he relied on them in any way. Indeed, the opposite it true. When, during his deposition, Jones was confronted with Price's scores, he stated that he needed to look further for real world results from Price, which he found were "[g]ood." (Doc. 22-3 at 15(58-59)).

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. There is no evidence that the scores should have been a factor at all, much less a determining one. And the Plaintiff fails to show how his higher score on the assessment rebuts any of the Defendant's proffered reasons for not hiring him.[21]

### c.    Deviation from Normal Hiring Procedures

Slaughter next argues that pretext can be shown because the Defendant deviated from its normal hiring procedure. In particular, Slaughter argues that the position for which he applied had, in the past, required a college degree, but that that

---

[21] The Plaintiff insists that the "history of [the Defendant's] disregarding Slaughter's higher test scores" is evidence of pretext. (Doc. 24 at 22). Presumably the Plaintiff is referring to the previous hirings of Sides and Guidry. He calls this the Defendant's pattern of "changing the 'rules of the game.'" (Doc. 24 at 22). The Plaintiff has offered no evidence that Jones or Morris were involved in either of those hiring decisions, or explained why any such decisions in those cases should have any relevance here.

requirement was lifted so that Price could be hired. (Doc. 24 at 19). The Eleventh Circuit has held that "'[a]n employer's violation of its own normal hiring procedure may be evidence of pretext.'" *Conner v. Lafarge N. Am., Inc.*, 343 F. App'x 537, 542 (11th Cir. 2009) (quoting *Bass v. Bd. of County Com'rs*, 256 F.3d 1095, 1108 (11th Cir.2001) (in turn citing *Hill v. Seaboard Coast Line R.R.*, 885 F.2d 804, 811 (11th Cir.1989))). In the instant case, however, the lifting of the requirement is not evidence of pretext since it equally benefitted Slaughter, who also did not have a degree.[22]

## IV.   CONCLUSION

Based on the foregoing, the Court concludes that the Plaintiff has failed to rebut the legitimate non-discriminatory reason that the Plaintiff was not promoted to the Production Supervisor position ultimately filled by Price. All other claims having been abandoned by the Plaintiff, the motion for summary judgment is due to be **GRANTED**. A final order will be entered.

**DONE** this 24th day of February, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[22] To the extent that Slaughter is arguing that the failure to use the assessment to award him the position was a deviation, there is no evidence that such assessments had ever been used as the determining factor in the past.